**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN S. TOBEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 18-cv-362 (APM)** |
| ) | |
| **U.S. GENERAL SERVICES** ) | |
| **ADMINISTRATION, et. al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Plaintiff John S. Tobey brings this action against Defendants United States General Services Administration ("GSA") and GSA Administrator Emily Webster Murphy, asserting claims of disability discrimination and retaliation, failure to accommodate, and hostile work environment in violation of the Rehabilitation Act of 1973.  Pending before the court is Defendants' Motion for Summary Judgment on all three claims.  For the reasons explained below, the court grants Defendants' Motion in full.

## II.    BACKGROUND

### A.    Factual Background

Plaintiff began working for GSA in July 2012 as a GS-13[1] Assistant General Counsel in the Real Property Division of the Office of General Counsel.  Defs.' Mot. for Summ. J., ECF No.

---

[1] GS-13 is the 13th paygrade in the General Schedule (GS) payscale, which is used to determine the salaries of most civilian government employees.  *See* Office of Personnel Management, *General Schedule Classification and Pay*, *available at* https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/.  The GS payscale has 15 paygrades, with GS-1 as the lowest and GS-15 as the highest.  *Id.*

36 [hereinafter Defs.' Mot.], Defs.' Stmt. of Material Facts [hereinafter Defs.' SoF] at ¶ 1.  His immediate supervisor was Catherine Crow, and his second-level supervisor was Barry Segal.  *Id.* ¶¶ 2, 4.  In October 2012, Plaintiff experienced serious gastrointestinal distress and underwent emergency surgery.  Pl.'s Opp'n to Defs.' Mot. for Summ. J. [hereinafter Pl.'s Opp'n], Pl.'s Separate Stmt. of Disputed Facts, ECF No. 41 [hereinafter Pl.'s SoF], ¶ 111 (citing Pl.'s Ex. 15, ECF No. 43-1, at PDF p. 5).  He was later diagnosed with Fibromyalgia, Chronic Fatigue Syndrome, and Irritable Bowel Syndrome, and submitted appropriate medical documentation to Crow.  *Id.* ¶¶ 124, 136 (citing Pl.'s Ex. 13, ECF No. 42-14, 57:2-3; Pl.'s Ex. 15, ECF No. 43-1, at PDF p. 56–57).  From late 2012 to early 2016, Crow granted Plaintiff's requests for accommodations including telework, advanced sick leave, an ergonomic chair, and assistance with lifting and hauling.  *Id.* ¶¶ 6–7 (citing Defs.' Ex. 3, ECF No. 37-4, ¶ 15).

The parties' relationship began to sour after the Office of Inspector General ("OIG") issued an audit report in September 2015, finding leave discrepancies for at least 6,800 GSA employees, including Plaintiff, Crow, and others in the litigation division.  Pl.'s SoF ¶¶ 80, 82 (citing Defs.' Ex. 26, ECF No. 37-27; Defs.' Ex. 1, ECF No. 37-2, at 69; Defs.' Ex. 27, ECF No. 37-28, ¶ 22).  Plaintiff had a discrepancy of approximately 150 hours.  *Id.* ¶ 83 (citing Defs.' Ex. 27, ECF No. 37-28, ¶ 22).  Plaintiff alleges that Segal and Crow pressured him to accept the audit report without providing adequate means or time to resolve his alleged deficiency.  *Id.* ¶¶ 184–87 (citing Pl.'s Ex. 12, ECF No. 42-13, 00148–00149).  Crow also denied Plaintiff's request to waive a number of his leave variances given his medical issues.  *Id.* ¶ 199.

In late 2015, Plaintiff's performance began to falter.  For instance, in November 2015, Plaintiff arrived thirty minutes late to a mediation session with a judge.  *Id.* ¶ 52 (citing Defs.' Ex. 14, ECF No. 37-15; Defs.' Ex. 4, ECF No. 37-5, ¶ 59).  In response, Crow issued Plaintiff a

Memorandum of Counseling, informing him that future misconduct of a similar nature would result in disciplinary action.  *Id.* ¶¶ 55–57 (citing Defs.' Ex. 14, ECF No. 37-15).  Plaintiff later submitted a medical letter explaining that it was his disability-related medication that caused him to oversleep.  *Id.* ¶ 272 (citing Pl.'s Ex. 15, ECF No. 43-1, at 136).

The following spring, on May 5, 2016, Plaintiff missed a call with another judge.  Feeling ill and incapacitated that morning, he requested unscheduled leave without informing Crow of the scheduled call later that day.  *Id.* ¶¶ 58, 201 (citing Defs.' Ex. 16, ECF No. 37-17).  Plaintiff disputes that he "missed" the call; although acknowledging that he did not notify Crow about the call and that he slept through the time for the scheduled call, he claims to have rescheduled it shortly thereafter.  *Id.* ¶ 204 (citing Pl.'s Ex. 13, ECF No. 42-14, Tobey Depo A 129:8-130:2; 133:12-19).  In response, Crow issued a Letter of Reprimand.  *Id.* ¶ 60 (citing Defs.' Ex. 16, ECF No. 37-17, at 1).

This incident triggered a series of events that exacerbated tensions between Plaintiff and his supervisors.  That same week, Crow unilaterally revoked Plaintiff's unscheduled telework and leave privileges, explaining that she was "under scrutiny" by her supervisors and that she did not feel "comfortable" granting telework on the basis of Plaintiff's medical condition moving forward. *Id.* ¶ 197 (citing Pl.'s Ex. 12, ECF No. 42-13).

Around that time, Plaintiff also met with his second-level supervisor, Barry Segal, to discuss Plaintiff's request to attend a National Institute of Trial Advocacy ("NITA") training course.  *Id.* ¶ 207 (citing Pl.'s Ex. 15, ECF No. 43-1, at 80).  Segal was concerned that Plaintiff's frequent absences might mean that he would be unable to attend the entire course.  *Id.* ¶¶ 91–94. Plaintiff claims that Segal forced him to explain the symptoms of his disabilities in "excruciating, embarrassing detail," and that Segal asked him, "If I pay for the training course, will you go or

3

will you get sick?"  Pl.'s Am. Compl., ECF No. 10 [hereinafter Am. Compl.], ¶¶ 60–62; Pl.'s SoF ¶ 208 (citing Pl.'s Ex. 12, ECF No. 42-13, at 00176).  Plaintiff also alleges that a similar incident occurred a year or two earlier, when Segal made Plaintiff justify his promotion to GS-14 by "grilling him on the gory details of his [Irritable Bowel Syndrome] symptoms in a humiliating manner."  Pl.'s Opp'n to Defs.' Mot. for Summ. J., Mem. of P. & A. in Support, ECF No. 41 [hereinafter Pl.'s Opp'n], at 23; Pl.'s SoF ¶ 164 (citing Pl.'s Ex. 13, ECF No. 42-14, Tobey Depo A 97:6–100:25; Pl.'s Ex. 12, ECF No. 42-13, at 00166).

On May 25, 2016, Crow and Plaintiff met for his mid-year performance evaluation, during which Plaintiff informed Crow that he intended to formally request permission to telework as a reasonable accommodation.  Pl.'s SoF ¶ 214 (citing Pl.'s Ex. 15, ECF No. 43-1, at 85–87).  That same week, Plaintiff submitted a formal request for reasonable accommodations to the Reasonable Accommodations Coordinator within GSA's Human Resources division.  *Id.* ¶ 13 (citing Defs.' Ex. 5, ECF No. 37-6, ¶¶ 8, 13, 35).  On June 16, Crow issued interim accommodations of unscheduled telework and leave.  *Id.* ¶ 18 (citing Defs.' Ex. 7, ECF No. 37-8; Defs.' Ex. 5, ECF No. 37-6, ¶ 13; Defs.' Ex. 4, ECF No. 37-5, ¶ 111).  On July 13, plaintiff submitted the medical documentation detailing his need for accommodations such as a standing desk, a dual 22-inch monitor, flexible hours, unscheduled telework, breaks for rest, and a communication plan.  *Id.* ¶¶ 23–25 (citing Defs.' Ex. 8, ECF No. 37-9).

About four months after Plaintiff submitted his request, Crow issued her final decision on Plaintiff's accommodations request.  She granted him a standing desk, a dual 22-inch monitor, flexible hours between 6:00 a.m.–7:00 p.m., unscheduled telework as needed, periodic breaks, and a communication plan requiring Plaintiff to communicate directly with Crow.  *Id.* ¶¶ 28, 32 (citing Defs.' Ex. 10, ECF No. 37-11, at 04452).  She denied other requests, however, including flexible

hours, flexible telework, and unscheduled breaks on days in which he had in-person work obligations, such as meetings, court hearings, and depositions. *Id.* ¶ 33 (citing Defs.' Ex. 10, ECF No. 37-11, at 04452–04453). She also denied the use of flexible hours for medical appointments and instead instructed that he take medical leave for any medical appointments or illness. Defs.' Ex. 10, ECF No. 37-11, at 04453.

Crow gave Plaintiff seven business days to submit a reconsideration request. *Id.* at 04454. Two days past the deadline, Plaintiff submitted the appeal to Segal, challenging the denial of work past 7:00 p.m., his inability to use the status feature on the office's instant messaging platform, and flexible hours for medical appointments; he also asked for a clearer communication plan to accurately track time and work. Defs.' Ex. 12, ECF No. 37-13. Almost two months later, on December 6, 2016, Segal denied Plaintiff's requests for reconsideration on various grounds. He first criticized Plaintiff's two-day delay in submitting the reconsideration request and ultimately rejected Plaintiff's request for flexible hours for medical appointments on the basis that Plaintiff's medical documentation did not establish "a need for frequent medical treatment or evaluation." Defs.' Ex. 13, ECF No. 37-14, at 04478–04479. Meanwhile, on October 13, 2016, Plaintiff filed a formal EEO Complaint against Crow and Segal with GSA's Office of Civil Rights. Pl.'s SoF ¶ 305 (citing Pl.'s Ex. 12, ECF No. 42-13).[2]

On December 9, 2016, Crow placed Plaintiff on a Performance Action Plan ("PAP")—a type of probationary period—due to a Minimally Successful grade on two critical elements of his 2016 performance review. *Id.* ¶¶ 70–71 (citing Defs.' Ex. 21, ECF No. 37-22); Defs.' Ex. 30, ECF No. 37-31, at 1. Among the concerns noted during the rating period were that Plaintiff had filed a motion with the Civil Board of Contract Appeals that contained so many errors he had to seek

---

[2] Over the course of the EEO investigation, Plaintiff amended the complaint several times to add a retaliation claim. Pl.'s Am. Compl. ¶¶ 10, 13. In 2018, the office issued a final decision dismissing all claims. *Id.* ¶¶ 15–17.

leave to file a corrected version, missed the aforementioned appointments with judges, and was late to another scheduled call with senior GSA officials. *See* Pl.'s SoF ¶ 72. As part of the PAP, Plaintiff was given 60 days to improve his performance. *See* Defs.' Ex. 30, ECF No. 37-31, at 1. During that time, however, Plaintiff was absent without leave for four hours one day, cancelled a meeting with clients minutes before it was scheduled to begin, and had negative interactions with clients who complained that Plaintiff was rude. *See id.* at 5–6.

From January to March 2017, Plaintiff took a leave of absence pursuant to the Family and Medical Leave Act. *Id.* ¶¶ 340, 343. Several months after his return to work, on June 15, 2017, Plaintiff was suspended for fourteen calendar days for Lack of Candor and for Failure to Follow Supervisory Instructions. *Id.* ¶ 62 (citing Defs.' Ex. 18, ECF No. 37-19). The Lack of Candor charge was based on a previous email exchange, in which Plaintiff misrepresented to Crow the completeness of a project at the time he requested unscheduled leave. *Id.* ¶ 63; *see also* Defs.' Ex. 17, ECF No. 37-18. Plaintiff also failed to follow Segal's instructions regarding a settlement, continuing to negotiate the terms after Segal had instructed him to stop. Pl.'s SoF ¶ 64 (citing Defs.' Ex. 18, ECF No. 37-19, at 00091). Because these performance errors occurred during the PAP rating period, Plaintiff received another Minimally Successful grade on one performance metric. *Id.* ¶ 72; *see also* Defs.' Ex. 22, ECF No. 37-23, at 002255. Consequently, per GSA policy, Crow denied Plaintiff a within-grade pay increase in June 2017. Pl.'s SoF ¶¶ 73–74 (citing Defs.' Ex. 22, ECF No. 37-23; Defs.' Ex. 23, ECF No. 37-24). Plaintiff appealed this denial, claiming that his performance deficiencies were due to his disabilities. *Id.* ¶ 76 (citing Defs.' Ex. 24, ECF No. 37-25). In September 2017, Segal upheld Crow's decision, concluding that Plaintiff's disabilities did not relieve him of the responsibility to perform the essential functions of his job. *Id.* ¶ 78 (citing Defs.' Ex. 25, ECF No. 37-26). On January 9, 2018, Plaintiff submitted his

resignation, citing incapacitation due to his multiple disabilities. *Id.* ¶ 95 (citing Defs.' Ex. 29, ECF No. 37-30).

### B.    Procedural Background

Plaintiff filed this lawsuit against GSA in February 2018, asserting claims of (1) discrimination and retaliation on the basis of disability, (2) failure to accommodate, and (3) hostile work environment, all in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Pl.'s Compl., ECF No. 1.[3]

Following discovery, Defendants moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See generally* Defs.' Mot. Defendants argue that Plaintiff's hostile work environment claim must fail because Plaintiff only points to isolated incidents occurring over a span of two years, which fail to meet the level of severity and pervasiveness required in an actionable claim. Defendants further argue that GSA provided Plaintiff reasonable accommodations since October 2012, and that the agency's denial of certain accommodations in May 2016 was motivated by non-discriminatory reasons. Finally, as to Plaintiff's retaliation claim, Defendants assert that GSA instituted disciplinary actions based on legitimate, non-discriminatory reasons, irrespective of Plaintiff's formal request for accommodations. Plaintiff, on the other hand, argues that GSA's conduct represented an ongoing, continuous violation of his rights, and that the disciplinary actions taken against him were unlawfully motivated by his disability.

---

[3] In his Complaint, Plaintiff states that he is seeking relief under the Rehabilitation Act and, "by incorporation, the Americans with Disabilities Act" ("ADA"). Pl.'s Compl. ¶¶ 88, 96, 101, 107, 116. Both the Rehabilitation Act and the ADA protect against workplace discrimination on the basis of disability, but the Rehabilitation Act provides the sole remedy for federal employees alleging such discrimination. *See Desmond v. Mukasey*, 530 F.3d 944, 952 (D.C. Cir. 2008) ("The Rehabilitation Act bars federal agencies from discriminating against employees with disabilities"); *Graffius v. Shinseki*, 672 F.Supp.2d 119, 125 (D.D.C. 2009) ("Section 501 of the Rehabilitation Act, codified at 29 U.S.C. § 791, is the exclusive remedy for federal employees alleging that federal agencies engaged in disability discrimination."). The standards applied to both statutes are the same. *See* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated . . . shall be the standards applied under [the ADA]."); *see also Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014). Therefore, cases that the court cites in this Memorandum Opinion that arise under the ADA apply equally to the Rehabilitation Act.

### III.   LEGAL STANDARD

Summary judgment is appropriate if the record shows that (1) "there is no genuine dispute as to any material fact" and (2) "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the litigation.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).  At this stage, the court views the evidence in the light most favorable to the non-movant and draws all reasonable inferences in his or her favor.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

To defeat summary judgment, the non-movant must set forth facts "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Conclusory allegations and unsubstantiated speculation do not create genuine issues of material fact.  *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008); *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  If the non-movant fails to make a sufficient showing on an essential element of his or her case, then the movant is entitled to a judgment as a matter of law.  *Celotex*, 477 U.S. at 323.  At the summary judgment stage, it is not the judge's role to weigh the evidence and determine the truth of the matter, but to determine whether a genuine issue for trial exists.  *Anderson*, 477 U.S. at 249.

### IV.   DISCUSSION

Plaintiff brings three types of claims under the Rehabilitation Act: (1) GSA discriminated against him by disciplining him for work performance errors related to his disability and retaliated against him when he submitted a formal request for accommodations and an EEO complaint;

(2) GSA failed to accommodate Plaintiff as early as October 2012 when it first received notice of Plaintiff's medical conditions and continued this violation when it revoked certain accommodations in 2016; and (3) GSA created a hostile work environment so severe and pervasive that it altered the terms of Plaintiff's employment.  The court addresses each claim in turn.

### A.      Discrimination and Retaliation

Plaintiff claims that Crow repeatedly engaged in discrimination on the basis of his disability, including by increasing his workload, engaging in harassment, taking disciplinary actions against him, placing him on a PAP, and denying him a within-grade pay increase. Am. Compl. ¶ 112.  Plaintiff also contends that these adverse actions were retaliatory because they were instituted after he submitted a formal request for accommodations in May 2016 and a formal EEO complaint in October 2016.  *Id.* at ¶¶ 132–33.  Defendants argue that every aspect of Plaintiff's claim must fail because GSA had a legitimate, nondiscriminatory reason for the disciplinary actions it took against Plaintiff.  Defs.' Mot. at 35.

### 1.      Discrimination

To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) he is a member of a protected group; (2) he suffered a "materially adverse" employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Chambers v. Burwell*, 824 F.3d 141, 144 (D.C. Cir. 2016).  Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), once a plaintiff establishes a prima facie case of discrimination, the defendant must then articulate some legitimate, nondiscriminatory reason for the challenged action. *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (discussing *McDonnell Douglas*).  If the defendant fails to do so, the employee is entitled to judgment in his favor. *Id.*  If the defendant proffers a legitimate reason, the prima facie case falls away, and the question

becomes whether, on the entire record, the employee produced "sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory [or non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee." *Id.* (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

Here, Plaintiff argues that he suffered several materially adverse employment actions "directly related" to his disability. Pl.'s Opp'n at 24. To begin, Plaintiff avers that the Memorandum of Counseling he received for being thirty minutes late to a mediation session with a judge was unjustified because the incident was caused by his disability medication, which caused him to oversleep. Pl.'s SoF ¶ 172. He also challenges as discriminatory the Letter of Reprimand he received in June 2016 for failing to inform Crow that he had a prescheduled call with another judge when taking unscheduled leave that day. *Id.* ¶ 239. Plaintiff contends that he was too incapacitated by his symptoms to check his calendar and inform Crow of the call. *Id.* ¶ 201 (citing Pl.'s Ex. 13, ECF No. 42-14, Tobey Depo A 129:8-131:11).

While the court accepts that Plaintiff's tardiness and absence at these two meetings was "directly related" to his medical condition, the Rehabilitation Act neither excuses an employee with a disability from performing the essential functions of his job nor does it shield him from workplace discipline when his job performance falls short. The D.C. Circuit's decision in *Carr v. Reno* is illustrative. 23 F.3d 525, 531 (D.C. Cir. 1994). There, an employee suffered from an ear condition that caused her to frequently miss work due to dizziness and nausea. The employee's symptoms, like Plaintiff's, were unpredictable, and despite her employer's efforts to provide several reasonable accommodations, the employee was unable to meet the essential, minimum expectations of the job and performed poorly. Ultimately, the employer terminated her on the

grounds that her "prolonged, frequent, and unpredictable absences render[ed] her unqualified for [the] job." *Id.* at 531.  The court held in *Carr* that the employer's action was justified because the plaintiff, even with accommodations, could not perform the "essential function" of coming to work regularly.  *Id.* at 529.  So, too, here.  GSA's disciplinary actions against Plaintiff were the result of Plaintiff's failure to perform an essential aspect of his job—making timely appearances before judicial officers.  The Rehabilitation Act does not immunize Plaintiff from those consequences, and he offers no evidence that GSA's non-discriminatory reasons for the discipline were in truth motivated by his disability.

Plaintiff also argues that his low performance ratings, subsequent placement on the PAP in 2016, and ensuing denial of a within-grade pay increase were rooted in discrimination.  Pl.'s Opp'n at 43.  He explains that three out of the five deficiencies identified in his PAP were based on events "out of [his] control" due to his disabilities.  *Id.*; Pl.'s SoF ¶ 334.  "Had [he] not suffered from his disabilities," Plaintiff posits, "he would not have been put on a PAP," and had he not been put on a PAP, he would never have been denied the within-grade pay increase.  *Id.*   But once more, the Rehabilitation Act does not protect Plaintiff from his failure to perform the essential elements of his job, and he raises no genuine dispute of material fact that would rebut the legitimate reasons offered for the discipline taken against him.  "If the employer's stated belief about the underlying facts is reasonable in light of the evidence and is honestly held, there ordinarily is no basis to put the case to a jury, even if the employee disagrees with the discretionary decision the employer made."  *Allen*, 795 F.3d at 41 (citing *Brady*, 520 F.3d at 495) (cleaned up).  Here, Plaintiff does not contest the shortcomings in performance that led to the PAP, such as the filing of a motion rife with errors, arriving late to a mediation, and missing scheduled calls and meetings with clients and senior GSA officials.  Pl.'s SoF ¶ 72.  Nor does he dispute that during the PAP he was absent

without leave for four hours one day, cancelled a meeting with clients minutes before it was scheduled to begin, and had negative interactions with clients who complained that Plaintiff was rude.  *See* Defs.' Ex. 30, ECF No. 37-31; Mem. of P. & A. in Reply to Pl.'s Opp'n, ECF No. 47 [hereinafter Defs.' Reply], at 23–24.  Plaintiff, in short, has proffered no evidence that creates a genuine dispute of fact that the reasons for his workplace discipline were pretextual.  His discrimination claim fails.

### 2.    Retaliation

Plaintiff also contends that GSA retaliated against him for requesting reasonable accommodations in May 2016 and for submitting an EEO Complaint in October 2016.  Am. Compl. at ¶¶ 132–33.  He alleges that GSA began to treat him "differently than it had previously, and differently from other similarly situated employees, and [took] adverse employment actions against him," only after he formally requested accommodations.  *Id.*

To show retaliation, a plaintiff must show: (1) that he suffered a materially adverse action (2) because he engaged in a statutorily protected activity.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008).  A "statutorily protected activity" is the "assertion of statutory rights (*i.e.* the *advocacy* of rights) by taking some action adverse to the company," such as filing a discrimination complaint.  *Hicks v. Ass'n of Am. Med. Colls.*, 503 F. Supp. 2d 48, 52 (D.D.C. 2007).  In retaliation claims, "materially adverse" refers to actions that are "harmful to the point that it could well dissuade a reasonable employee from making a charge of discrimination."  *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. 53, 57 (2006).

To survive summary judgment, a plaintiff may offer circumstantial evidence to support an inference of retaliation.  *Jones*, 557 F.3d at 679.  Examples of circumstantial evidence include

"temporal proximity" between the adverse action and the protected activity, evidence that the employer treated similarly situated employees more favorably, or evidence that an employer is lying about the underlying facts of its decision. *Allen*, 795 F.3d at 40. But temporal proximity, without more, is insufficient at the summary judgment stage to overcome an employer's legitimate, nonretaliatory reason. *Minter v. District of Columbia*, 809 F.3d 66, 72 (D.C. Cir. 2015) (granting summary judgment to employer because "positive evidence beyond mere proximity" is required "to create a genuine issue of material fact concerning whether the motive for [an adverse employment action] was . . . retaliation.").

To support his claim, Plaintiff avers that Crow threatened to charge him with being Absent without Leave ("AWOL") on June 14 and June 16, 2016, a "mere two weeks after Crow learned that [Plaintiff] filed a formal request for reasonable accommodations." Pl.'s SoF ¶ 242. Plaintiff also states that, around this time, Crow announced "for the first time" that Plaintiff had to state the number of hours of leave that he was requesting "to prevent any misunderstandings" and that if he failed to do so, "such absence [would] be charged to [AWOL], which is basis for disciplinary action." Pl.'s SoF ¶ 243. Moreover, Plaintiff asserts that Crow and Segal began to "shap[e] the narrative that [Plaintiff] was a bad employee" after he filed an EEO Complaint, and within two months, he was placed on a PAP. Pl.'s Opp'n at 24–25. But other than the temporal proximity of these events to protected activity, Plaintiff offers no evidence of pretext. It is undisputed that, by June 2016, Plaintiff twice had been late and missed meetings, thus justifying Crow's monitoring of Plaintiff's hours. Pl.'s SoF ¶ 72. Crow's scrutiny of Plaintiff fell within her discretion as his supervisor, and courts "hesitate to invade employers' discretion in workplace management" where the non-retaliatory and non-discriminatory baseline is "elusive of proof." *Allen*, 795 F.3d at 41. Also, as explained above, Plaintiff raises no genuine dispute of material fact as to the poor work

13

performance that resulted in the PAP and the denial of the within-grade pay increase.  Because these disciplinary actions are "reasonable in light of the evidence," there is no basis to put the case to the jury. *Id.* (citing *Brady*, 520 F.3d at 495).

Nor has Plaintiff shown that he was disciplined more harshly than other employees. To show discriminatory or retaliatory treatment, a plaintiff may provide evidence of a similarly situated colleague who is not part of the same protected class and who received more favorable treatment than the plaintiff.  *See Wheeler*, 812 F.3d at 1115.  To prove that another employee is "similarly situated," a plaintiff must show that he and the colleague were "charged with offenses of comparable seriousness," and that "all of the relevant aspects of [his] employment situation were nearly identical" to those of his colleague.  *Id.*  Here, Plaintiff cites one non-disabled GSA attorney who was not disciplined even though he missed a call while taking leave the day a filing was due, *see* Pl.'s SoF ¶ 240, but the circumstances are not comparable—the other lawyer missed a call from Plaintiff, not from judicial officers.  And, while Plaintiff points out that it was only after he received a Letter of Reprimand that Crow retroactively announced a "new" rule requiring employees to inform her of scheduled calls when requesting unscheduled leave, Pl.'s Opp'n at 41, as Defendants note, "[n]o rule needed to be announced for any attorney to know that you miss a call with a judge at your own peril," Defs.' Reply at 22.

In sum, the court concludes that Plaintiff's retaliation claim fails because Defendants have provided legitimate, non-discriminatory reasons for Plaintiff's disciplinary actions, and Plaintiff has failed to show that those reasons are pretextual.

### B.    Failure to Accommodate

Next, Plaintiff argues that GSA failed to accommodate his disabilities since October 2012, when he was first hospitalized, and that this delay lasted four years because GSA failed to refer

Plaintiff to the formal reasonable accommodation request process until May 2016.  Pl.'s Opp'n at 31, 35–36.  Defendants, on the other hand, argue that GSA provided reasonable accommodations on an informal basis since its first notice of Plaintiff's medical condition in 2012, and that the temporary revocation in 2016, which was restored in six weeks, is not evidence of a statutory violation.  Defs.' Mot. at 37–40.

To survive summary judgment on a claim for failure to accommodate, a plaintiff must show that: (1) he was a "qualified individual"; (2) the employer had notice of the disability; and (3) the employer denied the reasonable accommodation request.  *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014).  To establish that a request for a reasonable accommodation was denied, a plaintiff must show either that the employer "ended the interactive process" necessary to "determine an appropriate accommodation" or "that [the employer] participated in the [interactive] process in bad faith."  *Id.* at 31–32.  Additionally, an employer is not required to provide the exact accommodation requested by an employee, so long as the employer "provide[s] *some* reasonable accommodation."  *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (emphasis added).  The parties do not dispute that Plaintiff is a qualified individual or that GSA had notice of Plaintiff's disability.  Am. Compl. ¶ 37 ("At all times, Tobey was a qualified individual."); Defs.' Mot. at 37 ("For purposes of this motion GSA does not contest that plaintiff was a disabled person within the meaning of the Rehabilitation Act.").  The parties' dispute thus focuses on two issues: (1) whether GSA engaged in the "interactive process" in good faith to determine reasonable accommodations for Plaintiff; and (2) whether GSA's accommodations were adequate.

1.    *Failure to engage in the interactive process*

To determine a reasonable accommodation, an employee and employer must enter into a "flexible give-and-take," or an "interactive process," that identifies the precise limitations of the employee's disability and potential accommodations that can remedy those limitations. *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1167 & n.4 (D.C. Cir. 2010); *see also Ward*, 762 F.3d at 32.  Both parties must show good faith when engaging in this process, and employers may do so by taking steps like meeting with the employee, requesting and providing information about their condition, and discussing available alternatives when the employee's request is too burdensome.  *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 41–42 (D.D.C. 2011).

Here, GSA adequately engaged in the interactive process with Plaintiff beginning in October 2012, when Crow first received notice of Plaintiff's emergency surgery and permitted advanced sick leave.   Pl.'s SoF ¶¶ 6, 111–13.   Through May 2016, Plaintiff received accommodations such as telework, advanced sick leave, an ergonomic chair, and assistance with lifting and hauling.   Pl.'s SoF ¶ 7 (citing Defs.' Ex. 3, ECF No. 37-4, ¶ 15).   That these accommodations were provided outside of a formal request process does not mean GSA failed to engage in the interactive process.   *See Ward*, 762 F.3d at 32 (noting that the initiating of an "informal, interactive process" is sufficient under the Rehabilitation Act); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an *informal*, interactive process with the individual with a disability in need of the accommodation . . . ." (emphasis added)).   Thus, GSA began providing reasonable accommodations as soon as Crow had notice of Plaintiff's disability in October 2012.

GSA continued to engage in the interactive process in good faith throughout the summer of 2016, after Plaintiff submitted his formal request for reasonable accommodations.   GSA timely

16

requested and evaluated Plaintiff's medical documentation and allowed two extensions when Plaintiff could not meet the original deadline to submit the necessary documents.  Pl.'s SoF ¶ 16, 19–20.  During this period, Crow also permitted Plaintiff to telework without advance notice and take unscheduled leave, even though these privileges had not been formally granted.  *Id.* ¶ 21 (citing Defs.' Ex. 5, ECF No. 37-6, ¶ 13).

Even the brief revocation of accommodations for six weeks from May through June 2016 does not qualify as a breakdown of the interactive process.  The D.C. Circuit has said "there are certainly circumstances in which a 'long-delayed accommodation could be considered' unreasonable and hence 'actionable under the [Rehabilitation Act].'"  *Mogenhan*, 613 F.3d at 1168.  Courts in this jurisdiction weigh several factors to determine whether a delay is unreasonable, including the length and reasons for the delay and whether the employer offered any alternative accommodations while evaluating the request.  *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 38–39 (D.D.C. 2015).  Courts have recognized that an unreasonably long delay, such as three years, would violate the Rehabilitation Act.  *See Mogenhan*, 613 F.3d at 1168 (citing *Mayers v. Laborers' Health & Safety Fund of North America*, 478 F.3d 364 (D.C. Cir. 2007)).  A delay of four to six months, however, is not unreasonable.  *See Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 71–73 (D.D.C. 2019) (holding that "[a] four- or six-month wait is not inordinate time" for an agency to procure the requested accommodation).  In this matter, Plaintiff's accommodations were delayed for about six weeks; by June 16, 2016, Crow had restored Plaintiff's unscheduled telework and leave privileges by granting interim accommodations.  Pl.'s SoF ¶ 18 (citing Defs.' Ex. 7, ECF No. 37-8; Defs.' Ex. 5, ECF No. 37-6, ¶ 13; Defs.' Ex. 4, ECF No. 37-5, ¶ 11).  Therefore, this brief revocation of Plaintiff's accommodations does not represent a breakdown of the interactive process and thus is not actionable.

2.      *Adequacy of accommodations*

A second but related issue concerns whether GSA provided adequate accommodations to Plaintiff.  Plaintiff argues that GSA's refusal to waive his large negative leave balance amounted to a denial of reasonable accommodations because the discrepancy arose due to his medical issues. Plaintiff also argues that GSA's final provision of accommodations was inadequate.

To start, GSA's refusal to waive Plaintiff's large negative leave balance was not a denial of reasonable accommodations.  Indeed, the record demonstrates numerous good faith efforts by Crow and Segal to help Plaintiff reconcile his balance.  Over the course of two to three meetings, Crow sat down with Plaintiff to help reconcile his leave balances and allowed Plaintiff to make adjustments in his favor, even when he could not prove that he actually worked on days marked as leave.  Pl.'s SoF ¶¶ 86–87 (citing Defs.' Ex. 27, ECF No. 37-28, at 00463–00464; Defs.' Ex. 1, ECF No. 37-2, at 105; Defs.' Ex. 28, ECF No. 37-29, at 87).  Likewise, Segal advanced sick leave to Plaintiff to remedy the various discrepancies.  *Id.* ¶ 88 (citing Defs.' Ex. 2, ECF No. 37-3, at 49–53).  These efforts at compromise do not indicate a denial of a reasonable accommodation.

Nor does GSA's refusal to provide the precise accommodations Plaintiff requested amount to a statutory violation.  An employer is not required to provide the exact set of accommodations that an employee has requested.  *See Morris v. Jackson*, 994 F. Supp. 2d 38, 48–49 (D.D.C. 2013) (holding that the employer did not act in bad faith in refusing to grant an employee's specific request where it already took other reasonable actions).  In this case, Crow granted many of Plaintiff's accommodation requests, but denied him the ability to use flexible hours, flexible telework, and unscheduled breaks on days he had pre-standing obligations to be physically present at work.  Pl.'s SoF ¶¶ 32–33 (citing Defs.' Ex. 11, ECF No. 37-12, at 11-12).  Plaintiff argues that Crow and Segal did not provide a "justifiable reason" to limit Plaintiff's ability to use flexible

18

hours as needed to cover doctor's appointments, attend to disability-related symptoms, and take breaks, and that Crow's strict boundaries around flextime "substantially limited its practical use." Am. Compl. ¶¶ 106–107; Pl.'s Opp'n at 14, 39.  Specifically, Plaintiff could not count any hours worked after 7:00 p.m. toward his duty hours, resulting in Plaintiff working without compensation some evenings.  Pl.'s SoF ¶ 301 (citing Pl.'s Ex. 15, ECF No. 43-1, at 179).

Crow testified, however, that she denied flexible hours on days Plaintiff needed to be physically present because it is an "essential function . . . to appear at times and places," such as for "conference calls with Judges."  Defs.' Ex. 10, ECF No. 37-11, at 04450.  In her letter finalizing accommodations, she emphasized that Plaintiff could not complete his essential duties as a litigator with unscheduled absences, late arrivals, and periodic breaks.  *Id.*  Likewise, Segal testified that none of the other attorneys in his division had established duty work hours that extended past 7:00 p.m., Defs.' Ex. 2, ECF No. 37-3, at 114, and that Segal believed that Plaintiff should be able to complete his work assignments between the established hours of 6:00 am and 7:00 pm, Defs.' Ex. 13, ECF No. 37-14, at 2.  Plaintiff offers no reason to question the soundness of Segal's explanations.  GSA was not required to provide Plaintiff the "accommodation he requests or prefers"; it need only have "provide[d] *some* reasonable accommodation."  *Aka*, 156 F.3d at 1305 (emphasis added).  It did so in this case.  Therefore, the court grants Defendants' motion for summary judgment as to the failure to accommodate claim.

### C.   Hostile Work Environment

Finally, Plaintiff argues that GSA subjected him to a "hostile work environment whereby he was demeaned, shamed, humiliated, and harassed during the course of employment."  Am. Compl. ¶ 4.  Plaintiff points to the following actions by GSA to support his claim: (1) continuous, ongoing failure to provide reasonable accommodations; (2) inappropriate comments and

questioning by Crow and Segal about Plaintiff's disability; (3) pressuring Plaintiff to accept his leave audit deficits; (4) threatening to withhold employee benefits; and (5) harassing Plaintiff over his use of reasonable accommodations.  *Id.* ¶ 123.  Defendants counter that, in totality, GSA's actions do not meet the level of severity and pervasiveness required for an actionable hostile work environment claim.  The court agrees.

To prevail on a claim of hostile work environment, plaintiff must show evidence of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  This is a high standard; the Supreme Court has instructed that the conduct in question must be "extreme." *Faragher*, 524 U.S. at 775.  Conduct is "extreme" where it is of such a frequency and type that a reasonable person would view it as sufficiently abusive as to interfere with the employee's work performance.  *Id.*  Moreover, a plaintiff must show a linkage between the hostile behavior and the plaintiff's membership in a protected class.  *Grosdidier v. Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 108–09 (D.D.C. 2011); *see also Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) (finding no link between employee's race and employer's hostile behavior because "none of the actions that the plaintiff complains of . . . expressly focused on her race").  Courts look to the "totality of the circumstances," including frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's performance.  *See Harris*, 510 U.S. at 23; *see also Baloch*, 550 F.3d at 1201 (concluding that the employee's hostile work environment claim must fail because, after weighing several factors such as employer's reasons for disciplinary actions, whether the insults focused on race, religion, age, or disability, and whether the employee's alleged

20

harm had workplace consequences, the court determined that they did not rise to the level of a hostile work environment).

The incidents about which Plaintiff complains do not meet the severity necessary to constitute a hostile work environment claim.  First, many of the incidents are work-related actions by supervisors, including reprimands and punishment, that are "well within the bounds of ordinary tribulations of the workplace."  *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 138 (D.D.C. 2016) (citing *Faragher*, 524 U.S. at 788).  Courts typically do not find these actions to be actionable grounds for a hostile work environment claim.  *Id.*  Exclusions from meetings, unreasonable deadlines, denial of training opportunities, and other evidence of "less-than-ideal" working conditions are insufficient.  *Allen v. Napolitano*, 774 F. Supp. 2d 186, 205–06 (D.D.C. 2011) (concluding that the employee's general frustrations with her supervisors' management style and other complaints are "nothing more than typical employment grievances and workplace conflict").

For instance, Plaintiff argues that Crow harassed him over his use of reasonable accommodations, specifically that Crow "constantly changed the standards on requesting unscheduled telework or leave; overly scrutinized his work; regularly threatened him with AWOL and frequently charged him with it, even when he worked more than 9 hours in a day."  Pl.'s Opp'n at 26.  Plaintiff cites a December 7, 2016, email to illustrate Crow's opaqueness and defensiveness to Plaintiff's request for intermittent leave or situational telework and to show that she unfairly charged him with AWOL.  Pl.'s SoF ¶ 330 (citing Defs.' Ex. 17, ECF No. 37-18).  The record shows, however, that Crow permitted Plaintiff's use of telework "for the time [he] worked at home to create a draft," but charged AWOL for the time that he did not work, because "[i]f, in fact, [he] did not work, [he] did not have [her] approval." Defs.' Ex. 17 at 04484.  This is a reasonable disciplinary action taken by an employee's supervisor.  While Plaintiff may be frustrated by

Crow's scrutiny over his use of unscheduled telework, this does not rise to the level of severity required in a hostile work environment claim. *See Allen*, 774 F. Supp. 2d at 206.

Likewise, Plaintiff's claim that he received undue pressure to accept the OIG audit also fails. Plaintiff alleges that Crow and Segal called him up to three times a day to urge him to complete this task. Pl.'s Opp'n at 23. Plaintiff argues that the pressure to reconcile his hours substantially changed the conditions of his employment by taking Plaintiff away from substantive work. Pl.'s Opp'n at 24. Again, however, courts do not find typical work-related actions by supervisors sufficient for hostile work environment claims. *Aldrich*, 197 F. Supp. 3d at 138. Here, Crow and Segal's insistence that Plaintiff reconcile his hours discrepancy was not unique or discriminatory to Plaintiff, but rather a part of an agency-wide effort to resolve the problem. The OIG leave audit showed discrepancies for 11,000 GSA employees, including Plaintiff and almost everyone else in the litigation division. Pl.'s SoF ¶ 80 (citing Defs.' Ex. 26, ECF No. 37-27; Defs.' Ex. 1, ECF No. 37-2, at 69). Moreover, Crow "allow[ed Plaintiff] to make adjustments in his favor when he couldn't prove them" and gave him several months to resolve the discrepancies. Pl.'s SoF ¶¶ 86–87. Segal also agreed to advance sick leave to help Plaintiff reconcile his leave balance. Pl.'s SoF ¶ 88. These actions reveal GSA's effort to compromise. Therefore, events surrounding the audit do not support Plaintiff's claim of a hostile work environment.

Two incidents, viewed in the light most favorable to Plaintiff, do trouble the court. Plaintiff alleges that on May 11, 2016, Segal "grill[ed] him on the gory details of his [Irritable Bowel Syndrome] symptoms in a humiliating manner" and forced him to repeat this "embarrassing performance" to justify Plaintiff's request to attend the NITA training. Pl.'s SoF ¶ 208 (citing Pl.'s Ex. 12, ECF No. 42-13, at 00176); Pl.'s Opp'n at 23. Plaintiff alleges that Segal asked him, "If I pay for the training course, will you go or will you get sick?" Pl.'s SoF ¶ 208 (citing Pl.'s Ex. 12,

ECF No. 42-13, at 00176).   Given that the NITA training cost approximately $3,000, Segal was "concerned" that Plaintiff's frequent absences "might mean that he would be unable to attend all of the course."   *Id.* ¶¶ 91–94 (citing to Defs.' Ex. 2, ECF No. 37-3, p. 99–105).   A similar conversation occurred two years prior.   Pl.'s Opp'n at 23.   According to Plaintiff, Segal had recommended Plaintiff for a promotion, but had reservations about whether Plaintiff "would be able to handle the work load with [his] health."   Pl.'s Ex. 13, ECF No. 42-14, Tobey Depo A at 99.   In response, Plaintiff explained to Segal that his condition was not degenerative, and Plaintiff "went into explicit detail on everything with [Segal] because [Plaintiff] felt like [he] had to in order to not get [his] promotion pulled."   *Id.* at 97–98.

The court agrees that Segal's handling of these matters, if true, was tactless and insensitive. However, two such episodes occurring two years apart are not sufficiently pervasive to establish a hostile work environment.   *See, e.g.*, *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013); *Tillman v. Barr*, 2019 WL 2550736, *6 (D.D.C. June 20, 2019); *see also George v. Leavitt*, 407 F.3d 405, 408, 416–17 (D.C. Cir. 2005).   As other courts in this District have held, employers' "offhand comments[] and isolated incidents (unless extremely serious)" will not amount to a hostile work environment claim.   *Allen*, 774 F. Supp. 2d at 205–06; *see Tillman v. Barr*, 2019 WL 2550736, *5 (D.D.C. June 20, 2019) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)) (concluding that work-related, disciplinary actions by employers, even unpleasant incidents like a supervisor aggressively yelling at the employee on a mistaken belief, are insufficient grounds for a claim of hostile work environment).

Plaintiff also cites GSA's "continuous, ongoing violation" of his right to reasonable accommodations as evidence of pervasive hostile conduct.   Pl.'s Opp'n at 22.   He argues that Crow and Segal "eschew[ed]" their legal duty to provide accommodations as early as Plaintiff's first

hospitalization in October 2012, and that this violation continued until 2016. *Id.* But as discussed above, GSA provided accommodations to Plaintiff from the very start of his first hospitalization through the end of his employment, with the exception of a six-week period. Pl.'s SoF ¶ 6. Accordingly, Plaintiff's claim that the violation was "continuous" and "ongoing" holds no water.

Finally, Plaintiff has failed to adduce evidence showing a linkage between the employer's behavior and his protected status. *See Grosdidier*, 774 F. Supp. 2d at 108–09. Plaintiff argues that Crow and Segal began to "shap[e] the narrative that [Plaintiff] was a bad employee" after he submitted an EEO Complaint. Pl.'s Opp'n at 24–25. Plaintiff lists all the disciplinary actions he faced and how they are "directly related" to his disabilities. *Id.* at 24. For example, he attributes his tardiness to a side effect of a disability-related medication and claims that the lack of candor charge "would never have been raised had [Plaintiff] not requested telework." *See id.* at 25. GSA, however, provided non-disability related justifications for every disciplinary action it took against Plaintiff: a Memorandum of Counseling for being late to a mediation in December 2015 (which the Plaintiff admitted he had "no excuse," *see* Pl.'s SoF ¶ 52–53); a Letter of Reprimand for requesting a sick day but failing to inform Crow of a scheduled call with a judge later that day in May 2016; a suspension for lack of candor for misrepresenting the completeness of an assignment in September 2017; and a suspension for failure to follow supervisory instructions (Plaintiff conceded that this "does not necessarily implicate [his] disabilities," *see* Pl.'s Opp'n at 25 n.5). Plaintiff failed to show that any of these actions were taken due to his disability. *See Na'im v. Clinton*, 626 F. Supp. 2d at 63 (finding no hostile work environment where the plaintiff could not prove how disciplinary actions "expressly focus[ed]" on her race rather than her work performance).

Even viewing the record in light most favorable to Plaintiff, the court concludes that Plaintiff has failed to show that GSA created a hostile work environment based on his disability. Therefore, the court grants Defendants' motion for summary judgment as to the hostile work environment claim.

## V.    CONCLUSION

For the reasons set forth above, the court grants in full Defendants' Motion for Summary Judgment, ECF No. 36.  A separate final order accompanies this Memorandum Opinion.

Dated:  August 11, 2020

Amit P. Mehta
United States District Court Judge